## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

America First Legal Foundation,
Fight for Schools and Families, and
Parents Defending Education,

*Plaintiffs*,

v.

Miguel Cardona, in his official capacity
as United States Secretary of Education,
et al.,

*Defendants.*

Civil Action No. 1:22-cv-1947

## PLAINTIFFS' REPLY IN SUPPORT OF
## APPLICATION FOR PRELIMINARY INJUNCTION

J. Michael Connolly
Bar ID: 995815
Cameron T. Norris
Bar ID: VA083
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com

Christopher E. Mills
D.C. Bar No. 1021558
SPERO LAW LLC
557 East Bay Street #22251
Charleston, SC 29413
(843) 606-0640
cmills@spero.law

Gene P. Hamilton
D.C. Bar No. 1619548
AMERICA FIRST LEGAL FOUNDATION
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

# TABLE OF CONTENTS

Introduction ..................................................................................................... 1

Argument ........................................................................................................ 4

I.      Plaintiffs are likely to succeed on the merits of their claims. ........................ 5

    A.      The Council has an organized structure. ................................................ 8

    B.      The Council provides advice or recommendations. ............................... 11

    C.      The Council has a stable membership. .................................................. 16

    D.      The Council has specific purposes. ...................................................... 18

II.     The remaining factors weigh in favor of a preliminary injunction. ............... 19

Conclusion ..................................................................................................... 25

## INTRODUCTION

The government's only argument is that the Department of Education's "National Parents and Families Engagement *Council*" is not a "council . . . established or utilized by [an] agenc[y], in the interest of obtaining advice or recommendations." 5 U.S.C. app. 2 § 3(2). That is a stunning argument and belied by the undisputed evidence. Before this lawsuit exposed the government's FACA violations, the Department announced the Council by saying that "[t]he Council will help foster a collaborative environment where we can work together to serve the best interest of students." Declaration of Christopher Mills (ECF No. 3-2), Ex. 1, at 1. The Department's first press release said that the Council would "bring diverse parent voices *together to inform the Department's policies and programs*." *Id.* at 1–2 (emphasis added). One member organization—apparently informed about a hitherto-unrevealed application process that mysteriously chose 14 (or 16) members with the same views—said that the Council would give parents "a seat at the table." *Id.* at 1. Another said that Council members would "partner[]" as "key advisor[s]" to the Department "to ensure" certain "perspective[s]" "are included in decision making." *Id.* Ex. 52, at 1. The next Department press release reiterated that the Council "will work with the Department." *Id.* Ex. 2, at 1. And the day before the Plaintiffs moved for a preliminary injunction, the Department published a Council member's statement that the Council would give parents "a true seat at the table" and "input in the decision-making process" as the Council "work[s] with" Secretary Cardona. Supplemental Declaration of Christopher Mills, Ex. 1, at 4.

Now, according to the government and its declarant, the Council has "no specific purpose" or structure, and it passively and pointlessly receives information that the Department could simply provide the public. Opp. 17. The government claims that the Department will receive no recommendations or even advice from the Council—while simultaneously claiming that Council meetings are "critical operations" appropriately held in secret so that "the Department can obtain the benefits of the information it expects to gather from the Council." Opp. 22. And the government asserts that Council membership is fluid, even while acknowledging that the membership will soon be set for at least a year.

This Court should not credit the government's post-hoc efforts to escape the Federal Advisory Committee Act, which Congress enacted to eliminate "the wasteful expenditure of public funds for worthless committee meetings and biased proposals." *Cummock v. Gore*, 180 F.3d 282, 284 (D.C. Cir. 1999) (cleaned up). If the Department wanted to ask individual parents for views on education—an appropriate action, to be sure—it need not have convened a formal Council with set membership that it trumpeted as designed to work "together to inform the Department's policies and programs." Mills Decl. Ex. 1, at 2. But having established a Council to obtain advice via a group setting—hence the Department's requirements that Council members be adept at "[d]evelop[ing] comradery" and "[p]articipat[ing] in national meetings" (Declaration of Hayley Meadvin (ECF No. 9-1) ¶ 9)—the Department must follow FACA's disclosure and procedural requirements. It cannot avoid those requirements by its own bureaucratic ipse dixit. And because the Department does not dispute that

2

it has ignored FACA's requirements, a preliminary injunction is warranted.

First, the Plaintiffs are likely to succeed. The government does not contest standing. Nor does the government contest that the Plaintiffs are likely to succeed in showing that the Council and the Department violated FACA's requirements and the APA. The government does not dispute that the Council was not established in accord with FACA, is not fairly balanced, has been improperly influenced by the Biden Administration, and has violated FACA's public-disclosure requirements.

Instead, the government insists that FACA does not apply to the Council at all. Courts in this district have routinely rejected similar self-serving arguments, and the Council easily meets the statutory requirements for an "advisory committee." Under 5 U.S.C. app. 2 § 3(2), a FACA "advisory committee" means "any committee, board, commission, council, conference, panel, task force, or other similar group" "established or utilized by one or more agencies, in the interest of obtaining advice or recommendations." As reflected by its name, the Council is a "council." The government concedes that "the Department established the [Council]." Opp. 4. And the Council's point—as stated by the Department's press release announcing it—is "to bring" "voices together to inform the Department's policies and programs." Mills Decl. Ex. 1, at 1–2. The Council has the requisite organization, structure, and purpose. The Department selects its membership, convenes its meetings, and has given it set topics on which the Department wants to "obtain" "information" (Opp. 22)—in other words, advice. FACA cannot be avoided simply because an agency might rejigger advisory committee membership once a year. The government identifies *no*

*decision* holding that an entity like this Council is not an "advisory committee" under FACA. The government's only merit argument fails, and Plaintiffs are likely to succeed on the merits.

The other factors also support a preliminary injunction. The Plaintiffs face irreparable harm, for this biased Council with the government's official imprimatur will immediately affect the public debate in a direction contrary to the Plaintiffs' goals and missions. This effect cannot be unwound. Nor can the Plaintiffs go back later to devote the resources to their existing activities that they will be forced to instead expend responding to the unlawful Council. And the public's interest, as expressed by FACA, is limiting worthless committees and promoting public accountability. If the government believes the Council's work is important and urgent, then it need only follow FACA and keep the public apprised of the Council's activities. This Court should enjoin the Council's activities and bar the Department from receiving any advice from the Council until it is lawfully constituted.

## ARGUMENT

Each preliminary injunction factor supports immediate relief. First, the government does not contest most of the Plaintiffs' merits case. Its only defense— that the Council is not actually an advisory committee—finds no support in the statutory text, precedent, or the Department's own public statements. Second, the other injunction factors support the Plaintiffs. Allowing the Council to keep flouting FACA would impose irreparable harm on the Plaintiffs by distorting the public debate in a way contrary to the Plaintiffs' goals and missions, forcing them to immediately

change their operations and expenditures. FACA states the public interest in ensuring accountability and limiting expenditures for pointless or biased committees.

## I.   Plaintiffs are likely to succeed on the merits of their claims.

At the outset, the government concedes the most important parts of the merits. It does not contest that the Department and Council have failed to follow FACA's requirements and thus violated the APA. The Council was not announced in the Federal Register, does not have a fairly balanced membership, does not have a charter or a designated federal officer, and has disregarded FACA's other disclosure requirements. *See* Memorandum in Support (ECF No. 3-1, "Memo."), at 13–21; *see also Hedgeye Risk Mgmt., LLC v. Heldman*, 271 F. Supp. 3d 181, 191 (D.D.C. 2017) ("[U]nopposed arguments may be treated as conceded," particularly when a party "represented by counsel" "unambiguously failed to respond to [an] entire section of [the] motion."); *Day v. D.C. Dep't of Consumer and Regulatory Affairs*, 191 F. Supp. 2d 154, 159 (D.D.C. 2002) (similar).[1]

Nor does the government contest standing. And it agrees that the Plaintiffs have a cause of action under the APA. Though the government disagrees that mandamus is appropriate (Opp. 18), that is both irrelevant and wrong: irrelevant because the Plaintiffs are likely to succeed on their APA claim, and wrong because "[m]andamus is the *only* vehicle" for the Plaintiffs' claims against the Council itself. *NAACP Legal Def. & Educ. Fund, Inc. v. Barr*, 496 F. Supp. 3d 116, 145 (D.D.C. 2020)

---

[1] The Department has apparently chosen two new Council members since the Plaintiffs first filed suit: NAACP and Jack and Jill of America. Meadvin Decl. ¶ 5. The inclusion of these new members only exacerbates the Council's imbalance. *See* Supp. Mills Decl. Exs. 2–5 (NAACP) and Exs. 6–7 (Jack and Jill).

(emphasis added) (stating that "an advisory committee is not an agency subject to the APA and FACA provides no private right of action").

All that the government contests is whether the Council is a "council" that was "established" by an agency "in the interest of obtaining advice or recommendations." 5 U.S.C. app. 2 § 3(2). The Council is obviously a "council" "established" by the Department. *See* Opp. 4 ("the Department established the National Parents and Families Engagement Council"); *see* Mills Decl. Ex. 1, at 1. So the only statutory question is whether the Department established it "in the interest of obtaining advice or recommendations." It did. The official Department press release announced: "This Council provides the opportunity to bring diverse parent voices together to inform the Department's policies and programs." Mills. Decl. Ex. 1, at 1–2. Because "the meaning of the statute's terms is plain, [the Court's] job is at an end." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020).

Trying to avoid this conclusion, the government tries to layer atextual and contradictory qualifications on FACA's minimal statutory prerequisites. That effort is unavailing. "[T]he definition of 'advisory committee' is broad." *Barr*, 496 F. Supp. 3d at 123. To assess whether a council generally has "the group structure of an advisory committee" and may "render advice" "as a group," circuit precedent looks to whether the council has "in large measure, an organized structure, a fixed membership, and a specific purpose." *VoteVets Action Fund v. Dep't of Veterans Affs.*, 992 F.3d 1097, 1101, 1103 (D.C. Cir. 2021) (quoting *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 914 (D.C. Cir. 1993) ("*AAPS*")). But "a range

6

of variations exist in terms of the purpose, structure, and personnel" of advisory committees, and these factors are best viewed "as a continuum" rather than standalone requirements. *AAPS*, 997 F.2d at 915. The D.C. Circuit has said that at the far end of the continuum is "a formal group of a limited number of private citizens who are brought together to give publicized advice as a group," which "would seem covered by the statute regardless of other fortuities." *Id.* Though the government argues that FACA's definition of "advisory committee" must be "interpreted narrowly" (Opp. 8), its cited line of cases "concerns only the meaning of the word 'utilized' in FACA, not whether FACA, in its entirety, should be narrowly construed." *Barr*, 496 F. Supp. 3d at 140 & n.7. And the term "utilized" is not at issue here.

Moreover, the statutory inquiry "must [be] construe[d] in light of [FACA's] purpose to regulate the growth and operation of advisory committees." *AAPS*, 997 F.2d at 915. "FACA was enacted to cure specific ills, above all the wasteful expenditure of public funds for worthless committee meetings and biased proposals," and "its reach is extensive." *Pub. Citizen v. Dep't of Just.*, 491 U.S. 440, 453 (1989). It "ensure[s] that new advisory committees be established only when essential and that their number be minimized," and "that Congress and the public remain apprised of their existence, activities, and cost." *Id.* at 446; *see* 5 U.S.C. app. 2 § 2. The mere "objection of the executive branch" (Opp. 9) cannot free the administrative state of its requirements under FACA, else no bureaucrat would ever voluntarily submit to its public disclosure and accountability requirements.[2]

---

[2] In *AAPS*, the D.C. Circuit explained that "the government has a good deal of control

Here, the Council easily has a sufficiently organized structure, a stable membership, and an identified purpose to qualify under the statute as an advisory committee that renders "advice" to the Department. The Council is tasked with helping the Department "identify constructive ways to help families engage." Mills Decl. Ex. 1, at 1. Its work will "shape how American Rescue Plan" "funds are deployed." *Id.* Ex. 2, at 1. Its efforts will "inform the Department's policies and programs." *Id.* Ex. 1, at 2. It is a classic advisory committee.

### A.    The Council has an organized structure.

The Council has an organized structure composed of Department-selected representatives. *See* Mills Decl. Ex. 1; Meadvin Decl. ¶¶ 5–7. It is "coordinated and hosted by [Department] officials." *Pub. Emps. for Envtl. Resp. v. Nat'l Park Serv.*, No. CV 19-3629 (RC), 2022 WL 1657013, at *15 (D.D.C. May 24, 2022). The Department will convene its meetings and provide its resources. Meadvin Decl. ¶¶ 8–11. Those meetings will occur with regularity throughout the school year. *See id.* ¶¶ 8–10; *cf. Pub. Emps.*, 2022 WL 1657013, at *15 (sufficient organization where "[m]eetings were

---

over whether a group constitutes a FACA advisory committee" because "form is a factor." 997 F.2d 914. But once the government has established a committee and its form, the Court need not credit its post-hoc attempts to avoid adhering to FACA's requirements. That would be inconsistent with FACA's "purpose to regulate the growth and operation of advisory committees." *Id.* at 915. Hence the many decisions that reject the government's similar efforts to avoid FACA. *See, e.g.*, *Cal. Forestry Ass'n v. U.S. Forest Serv.*, 102 F.3d 609, 610 (D.C. Cir. 1996); *NAACP Legal Def. & Educ. Fund, Inc. v. Wilkinson*, No. 20-1132, 2021 WL 723993, at *13 (D.D.C. Feb. 24, 2021); *Barr*, 496 F. Supp. 3d at 137; *Elec. Privacy Info. Ctr. v. Nat'l Sec. Comm'n on Artificial Intelligence*, 466 F. Supp. 3d 100, 122 (D.D.C. 2020); *Heartwood, Inc. v. U.S. Forest Serv.*, 431 F. Supp. 2d 28, 36 (D.D.C. 2006); *Nw. Forest Res. Council v. Espy*, 846 F. Supp. 1009, 1010 (D.D.C. 1994) ("This case arises upon yet another attempt by the Executive Branch to escape the toils of FACA.").

held quarterly"); *Heartwood*, 431 F. Supp. 2d at 35 (sufficient organization even though the group only "met twice").

Precedent requires no more organization than this. Indeed, the government fails to compare this Council to *any* group that *any* court has held was insufficiently organized to constitute an advisory committee. The D.C. Circuit has held that even a "horde" of "340 virtually anonymous persons" can be sufficiently organized to be a FACA committee. *AAPS*, 997 F.2d at 914. And this Council is not some "*ad hoc* collection[] of private individuals.*"* Opp. 22 (quoting *VoteVets*, 992 F.3d at 1101). It is organized and convened by the Department for regular meetings with membership set for at least a year. *Cf. Nader v. Baroody*, 396 F. Supp. 1231, 1232 (D.D.C. 1975) (insufficient organization where "[a] different group" held "meetings every two weeks between different high officials of the executive branch and major business organizations or private sector groups").

The government's responses miss the point. First, the government notes that "[t]he Council has never met since it was formed and does not have any set meeting dates." Opp. 10. Obviously: it is a new council. And just as obviously, "[t]he Council will meet." Meadvin Decl. ¶ 10. In fact, the government threatens that Parents Defending Education will not be allowed to participate if it does not complete and submit an unknown application "in enough time to make the first meeting." Opp. 2.

Next, the government says that the Council "is not intended to work so much as a team as a collection of 'diverse parent voices.'" Opp. 10. Whatever that might mean, it does not change the fact that the Council has a structure of members selected

through Department-provided criteria from organizations chosen by the Department, convened in regular meetings on Department-assigned topics. *See* Meadvin Decl. ¶¶ 6, 9. And the Department itself trumpeted that the Council would "bring diverse parent voices *together to inform the Department's policies and programs*." Mills Decl. Ex. 1, at 1–2 (emphasis added); *contra* Opp. 10 (using ellipses to omit the word "together" from this quote). According to the Department, "[t]he Council consists of parent and family or caregiver representatives from national parent and family organizations that will work with the Department." Mills Decl. Ex. 2, at 1. And the government's own declarant notes that Council organizations are instructed to pick representatives who are adept at "[d]evelop[ing] comradery," "[p]articipat[ing] in national meetings," and "bring[ing] topics gathered from local meetings to [national] meetings." Meadvin Decl. ¶ 9. These skills would not be necessary to deliver individual factual reports to Department bureaucrats.

Last, the government notes that it has not yet "created or approved any formal organizational or leadership structure within the Council, and the Department has not directed or suggested that the Council form any subgroups working groups, and is not aware of any being formed." Opp. 9 (quoting Meadvin Decl. ¶ 14). Note first that the government does not claim that it *will* not create such a leadership structure, only that it has not already done so. Second, the government cites no case holding that advisory committee status turns on the committee's internal leadership structure. Indeed, FACA itself not only contemplates but requires that the agency *itself* appoint a "designated federal officer" who calls the committee's meetings, sets

meeting agendas, and is responsible for its operations. *See* 5 U.S.C. app. 2 § 10(e)–(f). Thus, the committee's present lack of internal leadership cannot preclude its characterization as an advisory committee under FACA. Otherwise, the government could always avoid FACA by not giving the committee some internal structure. *Cf. Nader*, 396 F. Supp. at 1234 (noting that the government cannot impose "the lack of formal organization" "out of a purpose to evade the statute"). The Council easily has sufficient organization to qualify as an advisory committee under FACA.

**B.    The Council provides advice or recommendations.**

Next, the government argues that "the Council does not provide group advice and recommendations." Opp. 11 (capitalization omitted). At the outset, the government's argument on this point does not cite and has no relation to the statutory text, which merely requires that an agency "establish[]" a committee "in the interest of obtaining advice or recommendations." 5 U.S.C. app. 2 § 3(2). The D.C. Circuit has rejected the proposition that the statute is limited "to those committees that would offer consensus recommendations." *AAPS*, 997 F.2d at 913; *contra* Opp. 12 (focusing on whether the Department "intend[s] to solicit consensus advice or recommendations"). Thus, it does not matter if advice is given through "sub-groups or individually, and not as one large group." *Heartwood*, 431 F. Supp. 2d at 35. Nor does it matter if members of the advisory committee "support decision makers with data, and not policy advice or recommendations." *Id.* at 34 (collecting cases). Nor does it matter "whether the federal government actually uses the" advice, "as long as the advice was *directed to* the federal government." *Sofamor Danek Grp., Inc. v. Clinton*, 870 F. Supp. 379, 384 (D.D.C. 1994), *aff'd sub nom. Sofamor Danek Grp., Inc. v. Gaus*,

61 F.3d 929 (D.C. Cir. 1995). Nor finally, contra the government's uncited assertion, does it matter if the committee "transmit[s] [a] *formal* recommendation" (or a "final" one). Opp. 13, 14 (emphasis added).[3] Instead, the central question is whether the Council was convened with some formality and structure "to inform the [agency's] policymaking." *Heartwood*, 431 F. Supp. 2d at 35; *Nw. Forest*, 846 F. Supp. at 1012 (asking if the committee was "a consultative assembly of knowledgeable persons").

Here, the Department organized and convened the Council "to bring diverse parent voices together to inform the Department's policies and programs." Mills Decl. Ex. 1, at 1–2. The Department says that the Council will "play a critical role" "in the decision-making process." Supp. Mills Decl. Ex. 1, at 4. These "express statement[s] that [the Council's] purpose is to provide recommendations" are entitled to great weight. *Gaus*, 61 F.3d at 937. The Council's organization and structure, including a stable membership, confirm that the purpose is to gather advice in a group setting. Otherwise, the Council need not exist. The government itself describes it as "critical" that it "obtain the benefits of the information it expects to gather from the Council"

---

[3] The government's discussion of a supposed "final recommendation" requirement (Opp. 14) is confounding. First, it quotes a district court case for a supposed "D.C. Circuit" "observ[ation]." *Id.* Then, it misrepresents the focus of that district court case, which was on the relevant entity's status as a sub-group that only provided advice to the parent committee subject to FACA. *See Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Priv. Sector Surv. on Cost Control*, 557 F. Supp. 524, 529 (D.D.C. 1983). Here, the Council *is* the advisory committee, "not subordinate to any other formalized decision-making body." *Pub. Emps.*, 2022 WL 1657013, at *17. That same issue is all that was at stake in the other case deceptively quoted by the government: "whether the subgroup transmit[ted]" advice to the "parent committee" or to the agency. *Elec. Priv. Info. Ctr. v. Drone Advisory Comm.*, 995 F.3d 993, 1002 (D.C. Cir. 2021) ("*EPIC*") (Opp. 13).

in "consultation[] on policy issues." Opp. 22. "The function of a group giving such advice" is "to aid the decision makers in choosing the direction of government behavior." *Jud. Watch, Inc. v. Clinton*, 76 F.3d 1232, 1234 (D.C. Cir. 1996).

The Council's members share this understanding of their role. One said it "look[ed] forward to partnering with all of the Council organizations" as "*key advisor*[*s*] to the Secretary of Education and his staff to ensure" that certain "perspective[s]" "are included in decision making." Mills Decl. Ex. 52, at 1. Another said that its role as a Council member was to ensure that "the voices of dads" are heard and that the Council would be "a great start to creating" "great solutions." *Id.* Ex. 53, at 2. Another—published by the Department—said Council members would "have a true seat at the table" and "input in the decision-making process" as they "work with" Secretary Cardona. Supp. Mills Decl. Ex. 1, at 4.

The government offers a variety of self-contradictory claims to argue that it does *not* in fact want advice or recommendations from the Council. The government calls it "[t]elling[]" that the Plaintiffs did "not argue that the Council renders advice or recommendations." Opp. 14–15. Nonsense. First, the Plaintiffs did argue that. *See* Memo. 12. Second, the Plaintiffs had no need to dwell on the point because it was (and is) obvious from the Department's own press releases that the Council would work "together to inform the Department's policies and programs." Mills Decl. Ex. 1, at 2. The government's assertion that the press releases "nowhere suggest[] that will be done as a group as opposed to as individuals" (Opp. 13) beggars belief. What other point could there possibly be in convening a Council with a stable membership? For

year-long *in camera* hearings of individual thoughts of random parents selected by private interest groups? Absurd. Thus the departmental press releases' focus on the Council as "together" "inform[ing] the Department's policies and programs" and "work[ing] with the Department." Mills Decl. Exs. 1, 2; *see also id.* Ex. 1 (Secretary Cardona: "The Council will help foster a collaborative environment where we can work together"); *id.* ("Organization representatives will reflect the diversity of the education system"); *id.* ("The Council will be a channel"); *id.* ("[T]he Council will hold local listening sessions"); *id.* Ex. 2 ("The Council meets to discuss"); *id.* Ex. 52 ("We look forward to partnering with all of the Council organizations"); *contra* Opp. 12, 14 (arguing that the Council is not "a unified whole" citing a case involving medical panels convened once with panelists providing individual ratings "confidential[ly]," *American Society of Dermatology v. Shalala*, 962 F. Supp. 141, 148 (D.D.C. 1996)).

Thus, "the circumstances of [the Council's] genesis support an inference that [it] was in fact established 'in the interest' of advising an agency and therefore is subject to FACA." *Cal. Forestry*, 102 F.3d at 611. And "[a]n agency must defend its actions based on the reasons it gave when it acted," not force "litigants and courts to chase a moving target." *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020); *see SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1017 n.1 (D.C. Cir. 1998) (what matters under FACA is "the Committee's creation" rather than "how the Committee was used"); 5 U.S.C. app. 2 § 3.

The government's other arguments fare no better. Every advisory committee "is a collection of individuals." Opp. 11. "[T]wo-way flow[s] of information" between

agencies and advisory committees (Opp. 14) are the *norm*. *E.g.*, *Elec. Privacy*, 466 F. Supp. 3d at 110 (committee received many "briefings from agencies" (cleaned up)). And contra the government's new suggestion that it "will only solicit the individual input of each Council Member" (Op. 12), the Department described the Council as "consist[ing] of parent and family or caregiver representatives from national parent and family organizations that will work with the Department to identify constructive ways to help families engage." Mills Decl. Ex. 2, at 1. Again, if that was all going to be done via one-on-one conversations between individual Council members and the Department, no formal Council would exist. And the Council would not "facilitate" or provide "a channel" for anything. *Id.* It would be pointless.

Likewise, though the government claims that the Council "'will meet so that all representatives can individually share information' with the Department" (Opp. 12), the whole enterprise of *joint* meetings means that the Council is more "than the sum of the parts." *AAPS*, 997 F.2d at 914. "The group's activities are expected to, and appear to, benefit from the interaction among the members both internally and externally." *Id.* at 913. By convening the Council, the government "recognizes [its] usefulness for political (and patronage) purposes" *as a group*. *Id.* at 914. Thus, "the Council meets to discuss" Department-selected topics. Mills Decl. Ex. 2, at 1.

Further, the Department is sending the Council out to "hold local listening sessions" "to better understand the needs of students." *Id.* The D.C. Circuit has considered a "working group" to be "an advisory committee [when] it was 'the point of contact between the public and the government.'" *EPIC*, 995 F.3d at 1000 (quoting

*AAPS*, 997 F.2d at 913). The government's declarant says nothing about these listening sessions. Surely the Department would not conduct parent listening sessions with no information given to the Department about what parents had to say. *But see* Opp. 13 (suggesting without support that the sessions are nothing "more than the receipt of information [by] Council members as individuals"). Regardless, by seeking the benefits of the Council—including advice and recommendations—as a group, the government is also subjected to FACA's requirements.

### C.    The Council has a stable membership.

The government next claims that a FACA advisory committee "must have 'a fixed membership.'" Opp. 15. Once again, that claim is both wrong and irrelevant. The committee's "form" is merely "a factor," and "a fixed membership" is just one indication of whether, "in large measure," a committee is sufficiently structured. *AAPS*, 997 F.2d at 914. According to the government's own case, even a "semi-stable membership" is sufficient. *Pub. Emps.*, 2022 WL 1657013, at *16; *id.* (rejecting any requirement for "a rigidly fixed membership"). And according to the government itself, the Council's membership will soon be fixed for at least an entire year. *See* Opp. 15; Meadvin Decl. ¶¶ 7–8 ("the Department anticipates that Council membership will remain constant for that school year"). This is easily sufficient to show that the Council has enough formality that it is intended to operate as a group.

The government's supposed "clearest evidence" that membership is meaningless is that it (secretly) decided to add "two new members" to the Council. Opp. 15. But "FACA would be rather easy to avoid if an agency could simply appoint" a new member to avoid FACA status. *AAPS*, 997 F.2d at 915; *id.* (FACA "must [be]

construe[d]" "in light of its purpose to regulate the growth and operation of advisory committees"). And given that this is a new Council that did not exist before a few weeks ago, two added members is not evidence of insufficient group formality.

Likewise, that the government apparently delegated precise Council member choice to the organizations it has chosen—"subject to [the Department's] review" (Opp. 15)—does not mean that the Council lacks sufficient formality or membership structure. The Department made the important choice of which organizations qualify. The Department gave those organizations criteria to choose their representative. Meadvin Decl. ¶ 9. And the Department has veto power over those choices. *See* Opp. 15. That organizations might "change their designated representatives" (with the Department's approval) (*id.*) is not uncommon. Again, in the government's own case, sufficient membership formality was shown when committee members "*represented* a core group of entities." *Pub. Emps.*, 2022 WL 1657013, at *16 (emphasis added). That the particular entity's representative might change does not negate that the *entity* was chosen for lasting membership on the committee. *Compare Freedom Watch, Inc. v. Obama*, 930 F. Supp. 2d 98, 99, 102 (D.D.C. 2013) (Opp. 12) (insufficient structure because "the individuals attending these meetings varied significantly" and the alleged committee "d[id] not exist"); *CREW v. Leavitt*, 577 F. Supp. 2d 427, 432 (D.D.C. 2008) (Opp. 12) (group had "two meetings" without "overlap in membership").

Last, the government's calling the Plaintiffs' statements about Council membership "conclusory" (Opp. 15) is a bit much, given that the government operated a secretive process that resulted in a dramatically unbalanced Council comprised of

organizations that overwhelmingly agree with the Biden Administration's preexisting policy views. The Plaintiffs could not say more *because the government violated FACA and did not publicize its creation*. That is the point of this lawsuit. The Council has sufficient group structure to qualify as an advisory committee.[4]

### D.    The Council has specific purposes.

Even as it acknowledges that apparently no court has ever refused to apply FACA because of a supposed lack of "specific purpose," the government asserts that the Council cannot be an advisory committee because it "plainly" has "no specific purpose." Opp. 16–17. Putting aside that FACA was *intended* to eliminate "worthless committee meetings," *Cummock*, 180 F.3d at 284, once again, any "purpose" requirement merely relates to whether the committee has a sufficient "form." *AAPS*, 997 F.2d at 914. As shown above, it does. And any "specific purpose" requirement is not strict, as the government's own argument reflects. In *VoteVets*, the D.C. Circuit found a sufficient purpose in "advising the Department of Veterans Affairs on 'the essential decisions' relating to veterans' affairs." Opp. 16 (quoting 992 F.3d at 1104–05). It is hard to get much more general than that purpose, which pertains to everything the VA does. *See also Pub. Emps.*, 2022 WL 1657013, at *16 ("[A]

---

[4] Whether Plaintiff Parents Defending Education "may request to join the Council" (Opp. 15) is irrelevant to likelihood of success here. In any event, the government gerrymandered the "objective criteria" supposedly "established prior to selecting any organizations" (Meadvin Decl. ¶ 6) to favor large, bureaucratic educational groups, which are overwhelmingly aligned with the Biden Administration. Even though Parents Defending Education mentors, advises, and provides policy guidance for dozens of local organizations across the country, it does not have local "chapters" and so would not qualify. Supplemental Declaration of Nicole Neily ¶ 3. Nor could other organizations apply, as the government *still* provides no details on how to apply or when the actual deadline is.

formalized group policy statement need not necessarily come to fruition before a committee is considered to be working as a group.")

Here, the government said that the Council would "work with the Department to identify constructive ways to help families engage at the local level." Mills Decl. Ex. 2, at 1. This was the Department's stated purpose for the Council, so it makes little sense for the government to now assert that this purpose has "no connection to any particular agency policymaking or agency goal." Opp. 16. That assertion is refuted by the fact that the Department created the Council. Nor does it make sense to say that the Council has no specified purpose because it has multiple, overlapping purposes. *See* Opp. 16. And yet again, letting the government evade FACA by stating only "generalized objectives" (Opp. 17) for an advisory committee would render the statute a dead letter. Post-hoc announcements of committee purposes using bureaucratic mumbo-jumbo is not a get-out-of-FACA-free card. *Cf. Gaus*, 61 F.3d at 937–38 (noting that an agency's "motive in characterizing a committee's goal may, depending on the circumstances, be suspect" as an attempt to "circumvent FACA").

Having established an advisory committee to advise the Department, the Department must follow FACA. Because the government does not contest that it has flouted those requirements, the Plaintiffs are likely to succeed on the merits.

## II.   The remaining factors weigh in favor of a preliminary injunction.

The other preliminary injunction factors also support relief.

***Irreparable Harm.*** The Plaintiffs face irreparable harm absent an injunction. The government nitpicks at the Plaintiffs' declarations but misses the main point: much like a violation of constitutional rights, a violation of FACA often

works irreparable harm. "District courts in this circuit have recognized that, where an obligation to disclose exists, plaintiffs may suffer irreparable harm if they are denied access to information that is highly relevant to an ongoing public debate." *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96, 110 (D.D.C. 2017) (collecting cases), *rev'd on other grounds*, 944 F.3d 945 (D.C. Cir. 2019). Thus, courts routinely grant equitable relief in FACA cases. *See, e.g.*, *Barr*, 496 F. Supp. 3d at 145; *Dunlap*, 286 F. Supp. 3d at 107, 109–11; *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 813 F. Supp. 82, 93-95 (D.D.C. 1993), *rev'd on other grounds*, 997 F.2d 898 (D.C. Cir. 1993); *Pub. Citizen v. Nat'l Econ. Comm'n*, 703 F. Supp. 113, 129 (D.D.C. 1989) (granting an injunction because "[t]he right to view the advisory committee's discussion of policy matters in public and the right to confront, through observation, the decision-making process as it occurs, will be obviated"); *Gates v. Schlesinger*, 366 F. Supp. 797, 800–01 (D.D.C. 1973); Memo. 25 (more).

In a footnote, the government admits that "informational injur[ies]" are cognizable "in the FACA context." Opp. 20 n.2. The government also acknowledges that the Council is working on highly relevant public issues. Opp. 22. Yet the government argues against a preliminary injunction because the Court could, at the end of this litigation, "order the Department to 'start over.'" Opp. 21. But "ongoing public" "debates about issues of vital national importance cannot be restarted or wound back." *Protect Democracy Project, Inc. v. Dep't of Def.*, 263 F. Supp. 3d 293, 301 (D.D.C. 2017) (quoting *Elec. Frontier Found. v. Office of Dir. of Nat'l Intelligence*, No. 07-5278, 2007 WL 4208311, at *7 (N.D. Cal. Nov. 27, 2007)); *Ala.-Tombigbee Rivers*

*Coal. v. Dep't of Interior*, 26 F.3d 1103, 1106 (11th Cir. 1994) ("If public commentary is limited to retrospective scrutiny, [FACA] is rendered meaningless.").

The government itself says that the Council will fulfill "important public goals" "in the near future"—before "the beginning of the school year" *in just weeks*. Opp. 22. Thus, the Council's unlawful distortion of public debates about education is imminent. The only decision relied on by the government for its "start over" idea involved a committee recommendation about a specific rule that would not be finalized for at least a year. *Young v. EPA*, No. 21-2623, 2022 WL 474145, at *4 (D.D.C. Feb. 16, 2022). Here, by contrast, the government agrees that the Council's actions will have immediate effects. "That fact distinguishes this case from those where the looming event is, for example, the promulgation of an administrative rule" months away. *Protect Democracy*, 263 F. Supp. 3d at 301.[5]

Further, without injunctive relief, the Council—packed with members beholden to the Biden Administration—will continue to operate with an undeserved "political legitimacy" and will steer conversations about K-12 education. *AAPS*, 997 F.2d at 914. "Congress passed FACA to open the advisory committee process to the public to prevent subjective influences not in the public interest from controlling the meetings." *Food Chem. News v. Dep't of Health & Hum. Servs.*, 980 F.2d 1468, 1472 (D.C. Cir. 1992) (cleaned up). This biased Council's advice could lead the Department

---

[5] FOIA requests (Opp. 21) are not a timely substitute for receiving information that FACA requires the government to immediately and freely provide. *See* Supp. Neily Decl. ¶ 4. Contrary to the government's red herring, the irreparable harm is not the "costs relative to [the Plaintiffs'] FOIA requests" (*id.*) but the imminent loss of information about and access to representation on the Council that FACA protects.

to go down any number of unfortunate paths. One-sided meetings could distort public debates. All this causes irreparable harm to the Plaintiffs' missions. Given that the Plaintiffs have "different priorities and viewpoints than the Council's members," Declaration of Nicole Neily (ECF No. 3-5) ¶ 10, the Council will likely influence public issues in a way detrimental to the Plaintiffs' missions and goals. The Plaintiffs will thus "need to devote extra time and resources to investigate and respond to the Council and its activities." *Id.* ¶ 12. "By expending extra time and resources in response to the Council," the Plaintiffs "must divert resources from [their] normal operations." *Id.* ¶ 13; *see also* Declaration of Ian Prior (ECF No. 3-4) ¶¶ 8–9; Declaration of John Zadrozny (ECF No. 3-3) ¶ 5.

The government's only response—that this is "simply a reallocation among priorities" (Opp. 19)—is unavailing: the Plaintiffs would not have to engage in these efforts if an unlawful Council with the U.S. Government's stamp of approval were not distorting the marketplace of ideas. And the government offers no explanation of how the Plaintiffs can somehow recoup these efforts—much less turn back the clock on a public debate—years from now. The government's own case establishes that such "'percetibl[e] impair[ments]'" of and "direct[] conflict[s] with" an organization's programs and mission "show[] irreparable harm." *D.C. v. Dep't of Agric.*, 444 F. Supp. 3d 1, 41 (D.D.C. 2020). "These harms from the forced diversion of resources are similar to those recognized as irreparable harm in other suits." *Id.* at 42 (collecting many cases); *see also Catholic Legal Immigrant Network, Inc. v. Exec. Office for Immigration Rev.*, 513 F. Supp. 3d 154, 176 (D.D.C. 2021); *NAACP v. USPS*, 496 F.

Supp. 3d 1, 11–12, 19 (D.D.C. 2020); *Whitman-Walker Clinic, Inc. v. HHS*, 485 F.

Supp. 3d 1, 57 (D.D.C. 2020); *Ind. State Conf. of NAACP v. Lawson*, 326 F. Supp. 3d

646, 662 (S.D. Ind. 2018) ("Where organizational plaintiffs are compelled to divert

and expend their resources," "this is 'enough to satisfy their burden of showing a

likelihood of suffering irreparable harm.'" (quoting *Action NC v. Strach*, 216 F. Supp.

3d 597, 643 (M.D.N.C. 2016))); *compare* Opp. 19 (one irrelevant case about standing).

Finally, the Council's membership criteria is unlawful and works irreparable

harm on the Plaintiffs because it resulted in a dramatically unbalanced Council—as

the government does not dispute. Rather than defend the gerrymandered criteria for

Council membership, the government asserts—incorrectly—that a preliminary

injunction is premature because Parents Defending Education "may well be eligible"

for membership. Opp. 20. Actually it is not, *see supra* p. 18 n. 4, and the fact that the

Plaintiffs "do not appear to be eligible" "according to the [Department's]

requirements" (Opp. 20) only reinforces the need for injunctive relief. These hitherto-

undisclosed "requirements" led to an unbalanced Council subject to improper

influence by the Biden Administration, so they do not provide the appropriate

baseline to decide proper membership on a properly constituted Council. Whether

such a Council would include the Plaintiffs or another voice who represents their

views, the current Council inflicts irreparable harm. A preliminary injunction is

necessary to prevent the irreparable harm caused by the Department's scheme.

**Balance of Equities and the Public Interest.** An injunction is appropriate

"if the unavailability of an injunctive remedy would effectively render FACA a

nullity." *Cal. Forestry*, 102 F.3d at 614. As shown, the government has unlawfully "ignore[d] the strictures imposed by FACA," including public disclosure and "prevent[ing] unbalanced commissions," "leaving the public to pay any concomitant price." *Dunlap*, 286 F. Supp. 3d at 111. An injunction "would promote FACA's purposes" by "reduc[ing] wasteful expenditures" and "enhanc[ing] public accountability." *Cal. Forestry*, 102 F.3d at 614 (quoting *Pub. Citizen*, 491 U.S. at 459). The government's suggested course—letting FACA violations continue for at least a year and then "starting over"—would disserve these purposes, to say the least.

The government has little response. First, contrary to the rest of its argument, it says that the Council must be "allowed to meet in the near future," or else "important public goals" "will be impeded." Opp. 22. But the requested injunction would not stop the Department and Council from doing anything but violating FACA. If the Department and Council follow FACA, they can have their crucial meetings (that supposedly involve no collaboration at all). And an injunction now would *preserve* public resources; according to the government, the Department has not yet "provided funding or workspace to the Council" and has no "schedule of planned meetings." Meadvin Decl. ¶¶ 11–12. "Start[ing] over" at the end of litigation (Opp. 21), by contrast, would waste significant public resources.

Likewise, the government's argument that the Council must be permitted "to commence its work so that the Department can obtain the benefits of the information it expects to gather from the Council" (Opp. 22) only eviscerates the government's merits argument, for it shows that the *Department* established the Council to "obtain"

"information." As shown above, such information, even if factual or obtained from group members, qualifies as advice or recommendations under FACA. And the government's argument does not advance its public interest point, for the Department can obtain the Council's advice and recommendations even under a preliminary injunction. It simply must follow FACA, which was "designed to prevent" the government from "convening a group of like-minded individuals, excluding duly appointed members with opposing viewpoints, and rubber-stamping the political agenda of the appointing authority." *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 464 F. Supp. 3d 247, 252 (D.D.C. 2020). Or the Department "may choose to form a committee composed only of federal employees and thus exempt from FACA." *In re Cheney*, 406 F.3d 723, 728 (D.C. Cir. 2005). *Or*, if the government actually wanted no more than the individual opinions of parents selected by other organizations—inexplicably chosen for their "comradery" and "national meeting[]" abilities, Meadvin Decl. ¶ 9—surely it has other methods of obtaining that information. "[F]act sheets," "toolkits," and "webinars," meanwhile, can easily be "provide[d]" publicly online. *Id.* ¶ 10. In all events, the public interest is in adhering to FACA and thereby preventing "worthless committee meetings" or "biased proposals" from wasting resources and distorting public debates. *Cummock*, 180 F.3d at 284; *see Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) ("[T]here is generally no public interest in the perpetuation of unlawful agency action.").

## CONCLUSION

For these reasons, the Court should grant a preliminary injunction.

Respectfully submitted,

_/s/ J. Michael Connolly_
J. Michael Connolly
Bar ID: 995815
Cameron T. Norris
Bar ID: VA083
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com

_/s/ Christopher E. Mills_
Christopher E. Mills
D.C. Bar No. 1021558
SPERO LAW LLC
557 East Bay Street #22251
Charleston, SC 29413
(843) 606-0640
cmills@spero.law

_/s/ Gene P. Hamilton_
Gene P. Hamilton
D.C. Bar No. 1619548
AMERICA FIRST LEGAL FOUNDATION
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

August 4, 2022